May it please the Court. Steve Sadie for the Petitioner's Mael Tablada. This case involves a challenge under the Administrative Procedure Act to a Bureau of Prisons regulation that increases the actual time prisoners serve by about seven days every year, based on an interpretation that good time must be credited against time served, rather than the historic practice and the interpretation of the Sentencing Commission, which applies good time credits against the Sentencing Commission. I have a question about the Sentencing Commission. The Sentencing Commission basically did this as, I mean, it wasn't directly applying the statute, but was using the statute or a concept about the statute to calculate past events, right, to figure out what had happened in the past with regard to sentences. Is that right? Not really. I think what they were, they were going to the historic, what the actual time served for a wide array of offenses was. Right. But then they modified what it was because they increased it by adjusted for good time credits. I understand it. But this is my question. Was the time period that they were covering when they did these calculations, the time period in which the statute was in effect? Yes. It was pursuant to the Sentencing Reform Act is in 1984. They, under 994M, the Sentencing Commission is given the responsibility of formulating the guidelines by November 1, 1987. Right. So when the packet of information that we provide at page 157 of the Sentencing Reform Act is in effect, that's what I'm trying to find out. The statute that you're, that's concerned here with respect to the 3624B is part of the Sentencing Reform Act, and it goes into effect on November 1, 1984. Okay. But I'm wondering in what period of time was covered by the calculations? The calculations, the description that the Sentencing Commission provides in the information that we've attached does not specify exactly when it was. They said it's fairly difficult because what they were looking for was people in criminal history category one for various offenses and then grading it depending on whether various aggravating factors may have been there or not. But one of the very interesting My problem is that if they were using sentences from a different, that went earlier than 1984 in figuring out what they, what kinds of sentences were ordinarily given, then they were using sentences. I mean, it almost seems difficult to think that they were covering this period because it would have been very close on to the time they were doing the calculation. I think that the, I think I understand the problem. Right. I think that the task that you have to remember that the Sentencing Commission was doing was figuring out what were people actually serving for this type of offenses and then knocking it up higher because we're saying that under, that Congress was saying we want harsher punishments. And so all they were doing was doing a baseline. But if you look at every Right. So they were trying to figure out what somebody who served X amount of time was actually sentenced to. And they used some rule of thumb for 15 percent, but if they were doing it for a time period that wasn't even covered by the current statute, it couldn't have been anything but just a bare estimate. Different task. Different task. And the task that they were trying to do was not trying to figure out how much good time was being given in the past. They just, who cares? It was under 3161. It depended on how much, it was more complicated gradation. But what they were trying to do is get a baseline of how much the time people actually served, set it into a table, and then add the 85 percent. And if you, the part that we quote throughout says that how much good time would they get in the future, in the future. So what they were trying to do is set, here's what people actually do. We'll set the, we'll adjust the table as we see fit. But we want to calculate it using how much they're going to get in the future under the 85 percent. So it's prospective. It's prospective. And that's why it's so important that basically every one of these, Mr. Tablada's sentence is being served at a rate higher than was anticipated by the Sentencing Commission because they used the 85 percent rule and the Sentencing Commission and the Board of Prisons is, instead of using the Sentencing Commission rule, is using an 87.2 percent rule of how much the minimum time you have to serve. The Board of Prison Appeals says you don't get any time until you've served it. It's a little bit like saying I'm not going to give you a tip until I've eaten. Right? You may figure you're getting 15 percent of whatever the bill is going to be, but until it's paid, you don't get the 15 percent. And here what I understand the Board of Prison Appeals saying is the statute reads for time served and that we mean to say we don't get time off until time served. The statute says term of imprisonment. Term of imprisonment. And they interpret that as time served. And under either, there's going to be, it's credit, there's going to be time where the person is not serving the sentence because they're getting credit for it. And I think that in the Moreland District Court case, they explained it very well. It's just a matter of accounting. And so the matter that the Sentencing Commission used is perfectly reasonable because it incorporates an accounting that allows for, that doesn't require, seven days extra time more than, and we've heard no explanation for it. We have held in this circuit that it's an ambiguous statute. Why should we be requiring more time than the Sentencing Commission used in calculating the time? This isn't at all exactly our current problem because we have earlier interpretations in the state, in the circuit. Then we have the issue as to whether it was, the regulation was properly promulgated. The United States has now conceded that it wasn't properly promulgated. And the question now is what do we do next? Yes. And what we do next, I think, partly look at the three violations. It was they didn't take into consideration, they didn't articulate the reasons for the rule, they failed to take into consideration a required element, and they made a legal error under NEDC. All those three things say that under 706-2A, it's an invalid rule and must be set aside. Okay. But unlike the rule in Arrington or whatever the name of that case was, this is essentially an interpretive, it's an interpretive, so they get up the next morning after there's no, the regulation's invalidated and they still have to either give this guy credit or not give this guy credit. So what do they do the next morning? Next morning they say, okay, here's the reason why we should be going to a level higher than what the Sentencing Commission used and what the sentence was based on. And if they can provide a good reason, that's fine. That's the regulation. But until they promulgate, the regulation in this instance really is just an interpretation of the statute. It's not a policy sort of or it's not an exception. It's not a delegation of any particular authority. It's simply they have to apply the statute one way or the other. So if they have no regulation, they still have to apply the statute one way or the other. They, yes, and that's why we're saying that the default mode here and what you should be requiring as once you set aside the invalid regulation, what you have left is the historical practice of providing the good time against the sentence imposed. And that same thing. But don't you have a program statement that implements the regulation or follows the regulation and shouldn't we, if we don't give that Chevron deference because the regulation wasn't properly promulgated, should we not give a Skidmore reference? No, Your Honor. I think that what we are looking at is whether any reason has been articulated for any step that is inconsistent with the Sentencing Commission's interpretation or the historical practice. And that is found nowhere. Well, the historical practice was based on a completely different statute. So it's really not particularly pertinent, is it? I think it's very pertinent, and I think that that's why Justice Stevens mentioned that and with a favorable analysis and incorporation of part of the Moreland District Court opinion, because the language isn't that different. It's the only reason that term of imprisonment is used instead of the sentence imposed is that there is now under the Sentence Reform Act a division between term of supervised release, term of imprisonment. So it's simply a term of art. I mean, frankly, in reading the sentence just ab initio, if what's going to mean what you say it means, it should have said up to 54 days for each year of the prisoner's term of imprisonment. It didn't say that. It says at the end of each year of imprisonment. So how can you calculate something at the end of the tenth year when the tenth year doesn't even happen? It's exactly what when Justice Stevens incorporated the Moreland opinion and said this looks like a very sensible analysis. They exactly said that. It's like at the end of the year is the what he uses was the Christmas in January. Is Christmas in January if at the end of the year means after the end of the year. It's at the end of the year, not after the end of the year. And it's probable that it's sort of improbable that a year isn't a year. But nonetheless, if the agency had decided to do that, it would be one thing. But if the agency decides not to do that, forget the regulation. Without a regulation, you know, Mr. Tablada is now coming up for his determination and they have to do it one way or the other way. And they say, you know, this doesn't make sense to us. This year, that isn't a year. We're doing it the other way. Now, why can't they do that without the regulation? Right now, they have not exercised discretion that's available. If you have discretion, you have to exercise that discretion. You have a statute, unlike any other. It's an ambiguous statute that they are interpreting in a way that have two ways of interpreting it. One way is to say that you have to do more time than the sentencing commission set in the sentencing table. But the sentencing commission isn't in charge of this problem. I would suggest that under 994 and under Mestreda that they are explicitly delegated with this problem. Of calculating, of coming up with some sentences that they're going to recommend and they did it in a certain way and they did it by adding 15 percent maybe because it was easier or harder or whatever. But as to what actually happens to people with regard to the good time sentence, that isn't committed to them, right? No, it is. The Mestreda was based on was a delegation that was approved, a congressional delegation to implement the Sentencing Reform Act in all of its aspects, including the micro work of figuring out the sentencing table. If you look to the – there's never been a single citation to a statute that accords to the Bureau of Prisons the ability to decide what the maximum available good time credits are. Yes, they say, did you violate – did you commit an offense or are we going to take something away from you?  They're supposed to. Those are ministerial tasks. But deciding that a person should spend, Mr. DeBlatt, 140 extra days in prison is not something that's ever been nor should be delegated to an executive agency. That's a judicial or legislative task. You might have asked this earlier, but you say the default position should be the 15 percent that the Sentence Commission has adopted. Why shouldn't it be the program statement that was adopted in 1992 and as Judge Bass said, gives good more deference to it? Why shouldn't that be the default position? Because if the regulation under which the time is being taken is invalid for the reasons that we've articulated and the same reasons, the same defects, in fact, the program statement, what's left? Again, we go to the default mode of what was the sentence based on? The sentence was based on a sentencing table that was calculated at 85 percent. This program statement that did not consider the problem of the – didn't articulate a reason, was not even aware that there was an ambiguity, so no discretion was even exercised until they showed – Well, first of all, I mean, after Booker, your whole argument seems a lot more difficult because the sentence proposed by the – the sentence in the sentencing guidelines isn't necessarily a sentence. In Gall, the Supreme Court just finished saying that every sentence, whether it's within or without the guideline range, the initial hook, what you base every sentence on, is that guideline table. You may decide that you want to go down for various reasons under 3553A. I hope that isn't what they said because I hope you hope it isn't what they said. Because what they actually said is you have to calculate it, but they didn't say what you have to do with it after you calculate it, and they specifically said you don't have to follow it. That's true. That's absolutely true that it's not mandatory in any way, but it provides the – it is one of the factors – one of the factors in 3553A, I think it's 6, is what the guideline range is. And so it is a very relevant factor, even after Booker, and, of course, Mr. Tablada was sentenced in 1990. Okay. Your time is up. Thank you very much. We'll give you a little time for that also. Good morning, Your Honors. May it please the Court. Kelly Zusman appearing on behalf of the United States. Mr. Sady referred to the loss of good time credit here, and that's not what happened. Mr. Tablada, like every other inmate, received from the Bureau of Prisons, pursuant to its rule, up to 54 days a year, and I'll read from the statute, that he may receive credit toward the service of the prisoner's sentence, beyond time served, of up to 54 days. And he receives that at the end of the year. Mr. Tablada has received 54 days per year of each time served, not the sentence imposed. This Court has already decided in Pacheco Camacho that this regulation is a reasonable  It's consistent with Congress's purposes. And if any of you were actually in the federal court system when we went through that change that occurred with the Sentencing Reform Act, you know what a huge shift that was. Going from indeterminate sentencing, that a judge, when he imposed a sentence of 15 years, it meant that the individual served five, or perhaps ten, and was then eligible for parole. The Sentencing Reform Act changed all of that. So to pluck a rule from the Presentencing Reform Act and say, apply it here, simply makes no sense. But, again, the problem we have before us is a discreet one. You've conceded that the regulation, parole regulation, is not valid. So the question is, what do we do at that point? For one thing, I mean, has the agency indicated what rule it is going to apply without the regulation, in effect? They're going to maintain the status quo. How do we know that? Why don't we at least remand the case? I guess I want to remand it, too. But it seems peculiar that we now we have essentially a vacuum, unless we regard the 1992 program statement that it was essentially overtaken by the regulation as sort of popping back in again. The usual remedy for a procedural APA violation is to maintain the status quo. The NEDC case, Mr. Sadie cited to the Court in a 28-J letter. That's precisely what this Court did. I thought that was the unusual remedy. The usual remedy is to have the valid regulation invalidated and inoperative. Right. And as in Paulson, what happened was then you look at what they were doing before the regulation. But Arrington didn't maintain the status quo. I'm sorry? Arrington didn't maintain the status quo. No. What Arrington said was you should go back to the regulation in existence before this one. The problem with trying to impose that here is that this regulation that's been challenged came into effect in 1997. The ten years prior to 1997, they were doing exactly the same thing. They did the regulation in 1997 in response to the Prison Litigation Reform Act. Because what's happened to 3624B is that three times Congress has changed the vesting rules. When Mr. Tablada was sentenced in 1990 in the District of Minnesota, the rules in effect said that he vested at the end of each year. And so after year one, he receives 54 days and it cannot be taken away. Then in 1994, Congress amended it again and said for vesting, you have to obtain a GED. And if your sentence is a year or less, you get no credit, which is why all of a sudden, you have to do it once in a day to make sure that they got sentence credit. Then in 1996, the Prison Litigation Reform Act changed the vesting rules again to say that they don't vest until the very end of the sentence when the person is released so that he can lose them at any time. So I'd like to turn to in terms of what do you do now. We have conceded that the Bureau of Prisons did not provide a rationale as to what the remedy should be. We suggest that the only thing that makes sense here, and I would direct your attention to the sugar cane decision, is, yes, there's been a procedural violation. It does not give rise to a substantive remedy, and it certainly doesn't give rise to allowing the Petitioner to tell this Court what the remedy should be. All of the reasons that judge ---- Kagan for this purpose, what kind of regulation we're talking about. In Arrington, I think what they were dealing with was an exception that was within the discretion of the agency but had to be exercised. Right. So there essentially was no background noise. If the agency didn't do it, it didn't exist. Here, we have a statute that has to be applied one way or another. Correct. And this regulation is essentially an interpretive regulation in the old language. Is that not the case? That's correct. And I agree. There's only ---- there are only two ways you could possibly interpret this. The Bureau has interpreted it as being time-served. Every circuit in the country has said that's an appropriate and correct interpretation. No court anywhere has adopted Mr. Tablada's formulation of the statute. What about this Moorland opinion he keeps talking about? That's from this, I believe, the Southern District of Texas. But it is a court. And it got adopted. It is a court. Every circuit court, including this one, Pacheco Camacho, Judge Kaczynski, referred to the alternative formulation as a windfall. Judge Kaczynski and this court have said that this regulation is an appropriate interpretation of the statute. Sugar King says you look at the amount of disruption and you look at the gravity of the error. Here, we had a regulation that went through notice and comment. No one commented on it. There was nothing for the Bureau to respond to. Kagan. What are the relative responsibilities of the BOP and the Sentencing Commission with regard to this statute? Mr. Satti has been arguing that the Sentencing Commission does have delegated authority with respect to this statute. Is that right? I don't believe so. 3624B gives the authority to determine good conduct time to the Bureau of Prisons. It's the Bureau of Prisons that calculates it. So, Frank, I don't understand that argument that he makes. Now, certainly the Sentencing Commission, had they weighed in in 97, when the Bureau published this rule and said, well, look, we really thought it should be 15 percent, that would have been a comment that the Bureau would have had to have responded to. But they didn't. The Sentencing Commission created their table. There's been no change. No one has reacted to the way the Bureau has been doing this for the last over 21 years. No one has said to the Bureau, you're doing this incorrectly. So it's a reasonable interpretation. It's the only reasonable way to hold this in place while the Bureau goes back and fixes that technical error under the APA. Again, the amount of disruption that this would cause, and there are over 24,000 inmates in the Ninth Circuit right now. There are 1,600 in community correction centers. If you were to suddenly say, calculate it differently, release all of these people right now, the Bureau has no place to put them. They have a very carefully crafted set of procedures in place for transitioning inmates from the prison into the community. They want to make sure that they have a place to live, that they have job opportunities, that they have educational opportunities. They look at their health issues. There are some inmates who don't transition into a CCC until later. Honestly, I think if you stick to the legal issues, you'd do better. Okay. Because, you know, if we needed to do it, we would do it. The question is, do we need to do it? And I think the answer to that is, you don't. You have a reasonable rule that interprets the statute correctly as defined by this court and as defined by every other circuit that has addressed it. The rule should be allowed to remain in place. Let the Bureau go back through notice and comment. Let them explain the rationale for the rule, but leave the current rule in place. What generates the fact that the Bureau of Prisons has to have a regulation at all in this question? Again, I think it was prompted by the Prison Litigation Reform Act. It's why they decided to issue the regulation, which interprets the vesting provisions. So we haven't challenged that the APA does, in fact, apply to how they go about a question. Well, how they do it, if they're going to do it. But the question is, what if they just didn't do it? Forget it. We're not going to have a regulation. We're going back to the program statement as to this point. Well, yeah, I think they certainly could go back to the program statement. Unless there are any further questions, I will submit. Okay. Thank you very much. I'll give you a minute or so. I think you are well over your time. Excuse me? You are well over your time, but we'll give you a minute. Thank you. The early practice has always been, and I have written on the backs of files for many years, was 85 percent when people asked what the actual time the person was going to be doing. The reason that we don't have comments, the reason that the rule was so invalid, is that the issue was never articulated and given an opportunity for comment. What about this 1992 program statement? Doesn't that do the same thing? It has the same defect, absolutely. But it was known what they were doing. You say, no, we didn't know what they were doing, but apparently. That they were making a choice regarding an ambiguous statute to do the seven days additional. If anybody had known that, of course, they would be commenting on it just as. . . But I don't understand why it wasn't known. If it had been being done, at least since, articulatively done since 1992, why wasn't it known? Because nothing was ever said that the mathematics that they were doing created this seven-day gap. That's why it has never been. . . Well, you found out it created a seven-day gap. In 1992, somebody in your position would have been able to calculate it, and Congress did nothing from 1992 onward to change 3624. And that is that Congress said that we are going to insist that the States have the same rule as following the 85 percent against time, against the sentence imposed. So we know from Congress that they thought that that was the 85 percent rule, just like I did. I was wrong. But still. . . I still have a real hard time. . . I understand your argument of phraseology, although I don't think it's all that clear. I mean, I think, indeed, it's probably contrary to the language, because it doesn't, as I said, it doesn't say for each term, each year of the prison's term. It says at the end. And at the end, it suggests that you're going to retroactively determine what he was getting for that year. And then it creates this complete conundrum with respect to what you do with the years you didn't serve. It doesn't at all. . . It only doesn't if you start calling a year as ending in 311 days. And if you look at the manual, they give them a period of time to figure out whether there's been mischief that's occurred during that time. They have a way of doing that perfectly reasonably. Any time you have credit for good time, you're going to be giving credit against time that's not served. And the same thing is, it's just a question of how much. And there's no reason for it to be seven days more. And there's no . . . Why are you going to be giving credit for time not served? Because you're getting credit, you're getting a good time credit instead of being in prison. And so that you're doing the judge in Moreland spelled out the accounting issue of why there's no, there is no windfall involved in any of this, providing it in the . . . There may not be a windfall, if the statute had been written that way. But the question is how you get from the language at the end of each year to doing it at the end of 311 days. Because a year with good time is 311 days plus 54 is 365 days. And there's been no precedent that I've ever seen that under 706.2a, that the rule of the mandatory language of the statute that says it must be declared unlawful and set aside is not put into effect. There are some very rare exceptions where there's notice of and comment issues, but never in the situation of 706. There's no reason for the extra incarceration. The implementation is easy because all it . . . Just to repeat, and then we really need to stop. When you take the regulation away, the question of how you interpret the statute still remains and has to be done. And you're then saying it has to be done in a certain way. And if they say, no, we're going to do it another way, the presence or absence of the regulation doesn't decide anything. What does it decide? It takes away the . . . It takes away the right difference. What's left is a statute that under Pacheco Camacho can be interpreted as either time served or against the sentence imposed. Right. Because what you look at when you've taken away the unlawful agency action . . . Okay. . . . is the action that the Sentencing Commission . . . All right. So that's your ultimate position. The answer is because you have to rely on the Sentencing Commission. The Sentencing Commission and the historical practice that Justice Stevens pointed out. Thank you very much. Thank you, counsel. Thank you. The case of Tablata v. Daniels is submitted, and we are in recess. Thank you very much. Thank you. Thank you. Thank you.
judges: Berzon, Bea, Gutierrez